[No. 27782. *En Banc.* June 26, 1940.]

ROPES, INC., *Appellant,* v. CARL RUBINSTEIN *et al.,*
*Respondents.*[1]

[1]Reported in 104 P. (2d) 329.

*Eggerman & Rosling,* for appellant.

*Skeel, McKelvy, Henke, Evenson & Uhlmann,* for respondents.

MILLARD, J.—Defendants, who are copartners engaged in the business of financing canneries and fisheries, entered into a contract March 5, 1938, with Suryan's, Incorporated, a domestic corporation, under the terms of which defendants agreed to lend money to Suryan's to assist the latter in its fishing operations for the 1938 season. At that time, Suryan's was indebted to a certain Seattle bank in the amount of twenty-five thousand dollars, payment of which was secured by a first mortgage on the borrower's boats and floating equipment.

The first type of loan by defendants to Suryan's under the agreement mentioned above was a fixed mortgage of thirty thousand dollars, secured by a second mortgage on the cannery boat and floating equipment. The second type of loan, which is the one involved in this action, consisted of advances against bills of lading covering the pack. These additional advances were to be made up to sixty-five per cent of the then net market value of the salmon consigned to and received by the defendants. Respecting the first type of loan, the pertinent portion of the contract reads as follows:

"It is understood that First Party [Suryan's] is obligated to purchase and recondition a scow or barge with living quarters and storage space thereon; to recondition the boat 'Commander'; to place its equipment and fishing appliances in proper shape and condition for efficient use; to obtain ample insurance upon its properties and pack; to have available money with which to procure supplies and equipment and said parties warrant that this will require an advance by Second Parties of approximately $30,000, and they agree to

make such advance up to the sum of $30,000 on orders of First Party. This $30,000 shall be advanced for purchases, insurance, labor, all kinds of preparatory supplies, and operating expenses as needed, provided that the items shall be specified and the amounts paid only upon invoices carrying out the purpose of this contract, approved by Parties of the Second Part [defendants]. For the advances so made Party of the First Part will execute and deliver to Parties of the Second Part a good and sufficient mortgage which shall be a second lien upon the 'Commander' and the properties of First Party now covered by a first mortgage in favor of Seattle-First National Bank. Second Parties shall also be given a first mortgage upon all land, trap locations, machinery, plant, equipment, and personal property used in connection with the cannery and fishing operations, which are not included in the mortgage to the bank."

The second type of loan, which has to do with the advances of money out of which plaintiff seeks payment of an assignment of a portion of that account by Suryan's to plaintiff, is governed by the following provisions of the contract:

"Second Parties [defendants] further agree to furnish or advance sufficient money to purchase cans and fibre boxes as needed by first party. As the pack is produced the same shall be promptly shipped and consigned to Parties of the Second Part at Seattle, Washington, upon order bill of lading, and upon arrival and passing inspection, or sooner at their option, Second Parties agree to make further advances up to 65% of the then net market value of the salmon so actually consigned to and received by Parties of the Second Part. Any advances beyond the above percentage shall be optional with the Second Parties. This 65% advance shall be above and addition to the mortgage loan of $30,000. Said advances within the above percentage include the cost of cans and containers. So far as cans and other packing material and supplies are concerned, these shall be considered a consignment of raw material for the purpose of manufacture and

title is reserved in Second Parties until the completed product, consisting of canned salmon, shall be sold and the Second Parties paid. Title to the contents shall follow the cans until such time as the contents shall be sold. The advances above mentioned shall include all freight, shipping expenses, insurance charges and other incidental expenses which Second Parties may pay for the account of First Party. All merchandise shall be inspected by the National Canners Association and shall pass government inspection and be certified to be sound, sweet and average for the district and season where packed and comply with the provisions of law as otherwise herein provided before the further advances of 65% of the market value are made. Whenever any salmon is sold all proceeds shall be used to pay the indebtedness, but in the event the proceeds are not sufficient, First Party agrees to pay the indebtedness in any event. All returns above the indebtedness owing Second Parties shall belong and be paid to Party of the First Part."

Under the terms of the contract, as will be noted from the above-quoted portions of the agreement, an attempt was made to protect the defendants on all loans they were required to make under the contract. The loan of thirty thousand dollars was secured by mortgage. The defendants retained title to all cans and containers supplied by them until the salmon was sold and the proceeds received by defendants, who were the sales agents of Suryan's. The payment of the advance of sixty-five per cent was secured. The contract provided that defendants were to be repaid advances, not by obtaining credit on future sixty-five per cent advances to be made under the contract, but from the proceeds from the sale of the salmon. The pertinent contractual provision is that, "whenever any salmon is sold, all proceeds shall be used to pay the indebtedness . . ." of Suryan's to defendants.

The fifteenth paragraph of this contract is to the effect that Suryan's warrants "that it has no debts, obli-

gations, or liabilities . . ." except in the amount of twenty-five thousand dollars due to a certain bank and approximately an equal amount owing to stockholders on promissory notes, and that the stockholder note creditors agreed to the execution of the contract and to the pledge and mortgage of assets to secure payment of the indebtedness created by the contract.

That warranty was untrue. Suryan's was at that time indebted to plaintiff in the amount of $2,950 for supplies sold in 1937 by plaintiff to Suryan's for use in equipping Suryan's cannery boat. The insistence of plaintiff that this obligation be paid resulted in a conference between plaintiff and Suryan's on April 19, 1938, at which time Suryan's executed the following assignment, which was accepted by defendants April 22, 1938:

"Rubenstein & Caraco,                    April 19, 1938
"Pioneer Building,
"Seattle, Washington
"Gentlemen:
    "This authorizes you to pay Ropes, Inc., any unpaid portion of our account with them out of the 65% advance money we have coming from the first shipment of salmon from Alaska, as per our contract, March 5th, 1938.
    "This will not exceed $2,000, and at that time we will inform you as to the exact amount owing.
    "Will you kindly forward copy of this to Ropes, Inc.?
"Accepted                    Very truly yours,
"RUBENSTEIN & CARACO         SURYAN'S INC.
    "By Carl Rubenstein.         By P. F. Norman"

At the time defendants accepted the assignment, none of the sixty-five per cent had been advanced. At that time, defendants had advanced $10,893.70 of the pre-season loan of thirty thousand dollars. On May 9, 1938 (seventeen days after defendants' acceptance of the assignment), Suryan's indebtedness to plaintiff was

reduced to two thousand dollars by the debtor's payment of $950 on account.

The first shipment of salmon arrived and passed inspection July 8, 1938. Its net market value, as computed by defendants, was $3,369.26. Sixty-five per cent of this is $2,190.02, or an amount in excess of the two thousand dollars Suryan's owed to plaintiff. Upon arrival of the shipment, and thereafter, plaintiff demanded that defendants pay to it two thousand dollars under the terms of the above-quoted assignment. Defendants recognized the order, accepted by them, as an assignment, but denied liability thereunder on the ground that no fund was created by Suryan's from which it could be paid.

Defendants' position was that the total advances made by them to July 8, 1938, in cash, credits, and consignments amounted to $118,000; that, if the pre-season loan of thirty thousand dollars on a second mortgage security be deducted, there was an amount of $88,000 to be considered as within the sixty-five per cent additional advance. It was argued that the financing agreement provides that the sixty-five per cent shall include containers, such as cans, boxes, and fibre products, necessary to pack the fish, and that the containers supplied from May 2nd to 17th, inclusive, 1938, represented a total advance of $68,401.19, which, if deducted from the $88,000, leaves $19,598.81 as cash advance outlay, against which the first shipment of salmon produced only $3,369.26, or a shortage of $16,229.65 from meeting the cash expenses at that time advanced to produce the pack arriving July 8, 1938.

Trial to the court of the action by plaintiff assignee against defendants for recovery on the assignment resulted in finding that, prior to the receipt of the first shipment of salmon, defendants' pre-season advances

exceeded the net market value of the first shipment; that the total received from the sale of all of the salmon shipped by Suryan's was less than the advances made by defendants, therefore a loss was sustained by defendants under the contract of March 5, 1938; hence, no fund ever came into existence out of which plaintiff was entitled to payment under the assignment of April 19, 1938. Judgment of dismissal was entered. Plaintiff appealed.

Respondents' position in this court, as in the trial court, is that the order of April 19, 1938, quoted above, of Suryan's for payment of not more than two thousand dollars by respondents to appellant out of the sixty-five per cent advance money Suryan's had "coming from the first shipment of salmon" constituted an assignment of funds to come into existence, but respondents were not barred by acceptance of that assignment from lending further advance operating expenses in conformity to the terms of their financing agreement of March 5, 1938, with Suryan's; and that the loans advanced to pay cost of production exceeded value of the product; therefore, a fund was not created by the fisherman (Suryan's) out of which the assignment could be paid.

Counsel for appellant insist that it was intended by the provisions of the contract, respecting the furnishing of cans and containers, that, in computation of the amount to be advanced under the sixty-five per cent provision, only the cost of the cans and containers in the shipment concerning which the computation was being made would be considered as a part of the sixty-five per cent advance.

We agree with the position of appellant that, by acceptance of the assignment of April 9, 1938, the respondents recognized their contract obligation to the assignor to make the sixty-five per cent advances against the consigned salmon, and that respondents

agreed that, upon the first shipment of salmon consigned to them, they would pay to appellant an amount equal to sixty-five per cent of the net market value of the first shipment but not to exceed two thousand dollars; that the effect of the acceptance of the assignment was to substitute appellant as the payee of two thousand dollars, and respondents were obligated to do nothing which would defeat such payment.

A case in point is *Roosen Co. v. Pacific Radio Pub. Co.,* 123 Cal. App. 525, 11 P. (2d) 873. One Kriedt was indebted to Roosen Company in the amount of nine hundred dollars for printer's ink previously purchased. Being pressed for payment, Kriedt sent plaintiff (Roosen Company) an assignment, notice of which was given to the defendant Pacific Radio Publishing Company; and that notice, after defendant's acceptance was appended, was also delivered to plaintiff. The notice given by assignor Kriedt stated, in part, that the Pacific Radio Publishing Company was authorized to pay the Roosen Company for Kreidt's account the sum of nine hundred dollars. No amount was then owed by the defendant to the assignor. It was agreed verbally, however, that the assignor would print an August periodical for the defendant. On the date of the acceptance of the assignment, a receiver was appointed for the assignor Kriedt, who printed the publication, and the defendant thereupon, instead of reserving for plaintiff nine hundred dollars of the price for printing the publication, paid the entire amount to the receiver. In upholding the assignment, the court said:

"Acceptance of a draft or order, whether negotiable or not, by one from whom moneys are to become payable, is not a collateral, but an original, direct and immediate contract between the acceptor and the payee, for which consideration may be furnished *aliunde.* (*Raborg v. Peyton,* 15 U. S. (2 Wheat.) 385 [4 L. Ed. 268].)

"Such contract constitutes a novation between the parties, and is subject to the rules applicable to contracts in general. . . .

"In *Bank of Harlem v. Bayonne,* 48 N. J. Eq. 246, 252 [21 Atl. 478, 480], the rights created in equity by an assignment are defined as follows: . . .

" 'From this it follows that neither payment to nor a release or discharge by the assignor, after notice of the assignment, can affect the rights of the assignee against the debtor. . . .

" ' . . . The debtor's acceptance or promise gives the assignee an action at law against him, not on the assignment, but on the promise; in equity, it neither creates, increases nor diminishes his liability to the assignee. (3 Pom. Eq. Jur., sec. 1280, and note 1.)'

"The contract expressly made between the defendant and Kriedt on August 8th sufficed to give equitable vitality then at any rate to the assignment, whatever its previous status had been; and when, after making a definite contract with Kriedt, the defendant accepted the assignment and fixed September 25th for payment, defendant assumed by that promise a direct and original obligation to the assignee cognizable in an action at law. . . .

" 'But by accepting the assignment, even though it be for only a part of the debt, the debtor admits the original debt, and to the extent of the sum called for in the assignment becomes the debtor of the assignee, and assumes the obligation to pay only him. In such a case the original indebtedness of the drawee will be deemed a sufficient consideration for the drawee's acceptance of the assignment and consequent liability to the assignee thereof. It is no defense to an action by the assignee of a debt that there was no consideration for the assignment. Owing the debt it is immaterial to the debtor to whom he pays it, provided he be protected against the demand of the original creditor for the payment of the same debt. This the assignment and its acceptance would fully do. Consequently the purpose and consideration of the assignment in the present case were no concern of the defendant. And an assignment of a debt which has been accepted cannot be rescinded or annulled at the mere option of the assignor.' . . .

"If, notwithstanding its acceptance and without seeking the advice of the court, defendant was so imprudent as to pay the entire contract price to the receiver instead of reserving $900 for plaintiff, neither that payment nor any acquittance from the receiver can be translated into a release of the defendant from its absolute liability to the plaintiff evidenced by its acceptance. After adopting the contract, the receiver stood in the shoes of Kriedt; and defendant could no more relieve itself of its positive obligation to plaintiff by settlement of its accounts with the receiver than by a settlement with Kriedt himself in derogation of the accepted assignment. (*McCloskey v. San Francisco,* 66 Cal. 104 [4 Pac. 1092]; *McCarthy v. Mt. Tecarte L. & W. Co.,* 110 Cal. 687, 691 [43 Pac. 391].) . . .

"The work in contemplation was done as agreed; but unfortunately defendant did not keep its promise to plaintiff." *Roosen Co. v. Pacific Radio Pub. Co.,* 123 Cal. App. 525, 11 P. (2d) 873.

In *Dickerson v. Spokane,* 26 Wash. 292, 66 Pac. 381, a city contractor was indebted to a laborer. The contractor to whom the city had agreed to pay a large sum of money for the work to be performed under the contract with the city gave the following order to the city comptroller:

" 'Please pay to Wm. Dickerson, the sum of $294 out of any moneys belonging to me or that may hereafter be due me from the city of Spokane on the waterworks contract.' "

The contractor delivered that order to Dickerson, who presented same to the comptroller and demanded payment. The comptroller took the order and retained same, but did not pay the assignee, although the comptroller then had sufficient funds to pay the order. Final settlement was made by the city with the contractor without paying the assignee. In an action against the city, a demurrer was sustained to the complaint on the ground that same did not state a cause of action. On appeal, we reversed the judgment of dismissal.

Paragraph six of the contract between the fisherman and respondents provides that all merchandise shall be inspected by the National Canners' Association, shall pass government inspection, and be certified to be sound, sweet and average for the district and season where packed, and comply with the provisions of law as otherwise therein provided *before the further advances of sixty-five per cent of the market value are made.*

This supports the position of appellant that none of the advances made prior to the first shipment was with respect to the sixty-five per cent provision of the contract, because this provision called for advances as to particular shipments as they were received by respondents. In further support of the argument of appellant that the sixty-five per cent advances were not to be made until the salmon was received by respondents, is the provision of the contract that, in connection with making the advances against the pack, it is understood that the respondents contemplate using the bills of lading, warehouse receipts, and other evidence of title as collateral *to secure the funds from the bank and others.*

■■ The advances made by respondents to the fisherman before receipt of the first shipment were in the class of pre-season advances. It is of no importance whether the advances upon which respondents relied as a defense were or were not made with respect to the sixty-five per cent provision. The rule is:

"But payment to the assignor, or discharge or release by him after notice to the debtor of the assignment, is no defense to the claim of the assignee; nor may the debtor, after receiving such notice, acquire new obligations of the assignor and offset them to the prejudice of the assignee." *5 C. J. 960, § 148.*

If the advances made before the arrival of the first shipment were considered as a portion of the sixty-five

per cent, they constitute payment of that fund to the assignor, which, of course, is not an exoneration as to the assignee. If the advances are deemed additional loans to the assignor, they constitute nothing more than claims acquired after the assignment, which can not be offset to the prejudice of appellant's assignment.

The statute, which reads as follows, also prohibits set-offs against assigned claims unless they existed at the time of notice of the assignment and could be set off at that time:

"The defendant in a civil action upon a contract expressed or implied, may set off any demand of a like nature against the plaintiff in interest, which existed and belonged to him at the time of the commencement of the suit. And in all such actions, other than upon a negotiable promissory note or bill of exchange, negotiated in good faith and without notice before due, which has been assigned to the plaintiff, he may also set off a demand of a like nature existing against the person to whom he was originally liable, or any assignee prior to the plaintiff, of such contract provided such demand existed at the time of the assignment thereof, and belonging to the defendant in good faith, before notice of such assignment, and was such a demand as might have been set off against such person to whom he was originally liable, or such assignee while the contract belonged to him." Rem. Rev. Stat., § 266 [P. C. § 8353].

In answer to the argument of respondents of a right under the contract of March 5, 1938, to reimburse themselves for the loans they were required to make, an examination of the contract will reveal that the agreement is not that the advances to be made by respondents will go to pay their loans, but that, whenever any salmon is sold, all proceeds shall be used to pay the indebtedness. This is different from a refusal to pay appellant under the provision for an interim loan of an amount equal to sixty-five per cent of the first ship-

ment, to which respondents agreed by acceptance of the assignment.

It is not a question of application of the proceeds of sales of fish. This case has to do with a loan upon the first shipment to be made when the shipment was received, regardless of the time the sale of the fish might ultimately occur and the price received for those fish. In some cases, the fish were not sold until months after they were received. It would be a forced and unreasonable interpretation to hold that the contract of assignment contemplated awaiting until that time for payment under that assignment.

*Taylor v. Parish,* 86 Wash. 141, 149 Pac. 635, is distinguishable on the facts from the case at bar. In the case at bar, respondents did not place any limitations on their acceptance of the assignment. Had respondents intended to make a limitation contrary to the legal rule that payments made by the acceptor subsequent to the assignment can not defeat the assignment, such limitation should, and doubtless would, have been stated—which it was not—by respondents on the face of the assignment.

The financing contract did not provide for reimbursement of respondents for advances by crediting such advances against future sixty-five per cent loans to be made under the contract, but, quite the reverse, clearly, specifically, provided that such reimbursement should be made "Whenever any salmon is sold all proceeds shall be used to pay the indebtedness." That is, the loans were not to be paid until subsequent to the sale of the salmon, which would be, of course, at a time after the date the first shipment was received, at which time appellant's assignment attached to the loan required to be made. It was not understood by, it was not the contract of, the parties that appellant was to be paid out of the final proceeds of the entire contract.

It was understood, and the parties so agreed, that appellant was to be paid out of the first interim loan to be made during the performance of the contract.

The judgment is reversed, and the cause remanded with direction to the trial court to enter judgment in favor of appellant in the amount for which it prays.

MAIN, ROBINSON, SIMPSON, JEFFERS, and DRIVER, JJ., concur.

BLAKE, C. J., (dissenting)—I dissent. It seems to me the implication is clear that all the parties contemplated Suryan's, Inc., would make a profit in its operations, and that the assignment was made, delivered, and accepted on that understanding. In other words, it was not contemplated respondents would be required to pay appellant unless they had recouped their advances and held a surplus for the account of Suryan's, Inc. Since respondents did not recoup their advances to Suryan's, Inc., and held no money for its account, over and above their advances, they should not be held liable on the assignment. *Taylor v. Parish*, 86 Wash. 141, 149 Pac. 635.

I think the judgment should be affirmed.

BEALS and STEINERT, JJ., concur with BLAKE, C. J.