[No. 28361. Department Two. August 11, 1941.]

E. P. WHITING, *as Receiver, Respondent,* v. CARL
RUBINSTEIN *et al., Appellants.*[1]

[1]Reported in 116 P. (2d) 305.

*Skeel, McKelvy, Henke, Evenson & Uhlmann,* for appellants.

*C. E. H. Maloy* and *Julian O. Matthews,* for respondent.

MILLARD, J.—The statute (Rem. Rev. Stat., § 5831-2 [P. C. § 4532-2], subd. (b)) provides that if an insolvent corporation makes a transfer of any of its property to one who has reasonable cause to believe that such transfer would effect a preference; or (Rem. Rev. Stat., § 5831-2 [P. C. § 4532-2], subd. (a)) if an insolvent corporation, within four months prior to the filing of an application for the appointment of a receiver of such corporation, makes a transfer of any of its property, ·and the transfer would enable any one of the creditors of the insolvent corporation to obtain a greater percentage of his debt than any other of such creditors of the same class, such transfer is a void-

able preference; and the receiver of the insolvent corporation may recover from the transferee the property or its value if he institute action therefor within six months from the time of the filing of the application for the appointment of such receiver. (Rem. Rev. Stat., § 5831-1 [P. C. § 4532-1].) That is, it is necessary to show that the preferred creditor had reasonable cause to believe that the transfer would effect a preference, if the preference took place more than four months before the application for the appointment of the receiver; but as to preferences made within four months prior to such application, no knowledge on the part of the preferred creditor is necessary.

The statute further provides that if a creditor has been preferred, and afterwards in good faith gives the insolvent corporation further credit without security of any kind of property which becomes a part of the assets of the insolvent corporation, the amount of such new credit remaining unpaid at the time of the application for the appointment of a receiver for such corporation, may be set off against the amount which would otherwise be recoverable from the preferred creditor. (Rem. Rev. Stat., § 5831-2 [P. C. § 4532-2], subd. (c).)

Application was made May 19, 1939, for appointment of plaintiff, who qualified as such receiver June 7, 1939, as receiver for Suryan's, Inc., a domestic corporation. On the theory that the transfer, September 3, 1938, by the insolvent corporation of the barge "Ruby" to Carl Rubinstein and Eliezer Caraco, copartners doing business under the firm name of Rubinstein & Caraco, constituted an unlawful preference, an action was timely instituted by the receiver to recover the value of the barge as of the date of the alleged preferential transfer.

As a first affirmative defense, the copartners pleaded

the financing agreement of March 5, 1938, between the copartners and Suryan's, which contract was before this court in *Ropes, Inc. v. Rubinstein,* 4 Wn. (2d) 380, 104 P. (2d) 329, and *Whiting v. Rubinstein,* 7 Wn. (2d) 204, 109 P. (2d) 312. The copartners further alleged that they purchased the barge "Ruby" May 9, 1938, from Pirate Fisheries Company pursuant to a verbal agreement with Suryan's that title to the barge was to remain in the name of the copartners, or their nominee, subject to the right of Suryan's to purchase the barge during the fishing season, or within a reasonable time after the close of the season, by payment to the copartners of the purchase price of the vessel, together with cost of all repairs of, and equipment placed on, the vessel by the copartners. It is alleged that H. E. Mansfield, one of the incorporators and officers of Suryan's, handled all negotiations for purchase of the barge, and, in violation of the agreement, took title to the "Ruby" in his own name instead of in the name of the copartners; that, upon discovery by the copartners of that fact, September 3, 1938, Mansfield, upon their request therefor, transferred the title to the copartners.

As a second affirmative defense, the copartners pleaded as an offset against the value of the "Ruby" all sums expended by them in purchase of the vessel, plus expenditures by the copartners for repairing and equipping the barge. As a third affirmative defense, the copartners pleaded that, since the alleged transfer September 3, 1938, was made more than four months prior to the filing of the application May 19, 1939, for appointment of a receiver for Suryan's, the preference, if one, could not be set aside. This third defense is of no consequence as the transfer of the "Ruby" was made by the insolvent corporation to the copartners when the copartners knew, or had reasonable cause to

believe, that Suryan's was insolvent and that the transfer would effect a preference.

Summarized, the copartners' defenses were that the "Ruby" was at all times owned by them, but that, if they did not own the vessel, they were entitled to offset against the value of that vessel, as of the date (September 3, 1938) of its transfer to the copartners, liens of a maritime character against the vessel to which they had become subrogated by reason of having paid same.

The trial court found, in effect, that the "Ruby" was owned by Suryan's; that the copartners, who acted in bad faith, knew, or had reasonable cause to believe, September 3, 1938, when the "Ruby" was transferred to them by Suryan's, that the corporation was insolvent and that such transfer would effect a preference; that those who repaired and those who furnished materials and equipment for the "Ruby" relied for payment upon the guarantee and credit of the copartners, therefore they had no maritime lien against the vessel to which the copartners, who relied upon the credit of Suryan's and the security they had in the financing contract of March 5, 1938, could be subrogated; that the copartners were estopped to claim any maritime lien upon the "Ruby" because of their unreasonable delay in claiming any such lien during which time the rights of creditors intervened; and that, prior to the copartners' claim of a maritime lien, under the rule of application of payments, all items of advancements had been discharged. Pertinent portions of the findings read as follows:

"Defendants Rubinstein & Caraco debited Suryan's Inc., and charged against Suryan's Inc. upon the books of Rubinstein & Caraco all of the above-mentioned advances as and when made, including all advances made on account of the purchase price and repairs for the barge 'Ruby', and charged Suryan's Inc. with interest

upon all such advances at the rate of one-half of one percent per month. Suryan's Inc. transferred and turned over to the defendants Rubinstein & Caraco all salmon packed during the 1938 season, and defendants Rubinstein & Caraco sold said salmon and realized, in addition to brokerage charges made by them for their services in selling said salmon, the sum of $106,352.22, and, as the proceeds of said sales were received by defendants Rubinstein & Caraco, credited such sums to the account of Suryan's Inc. The defendants Rubinstein & Caraco also credited Suryan's Inc. upon said account for returned merchandise, the amount received on the foreclosure of the chattel mortgage hereinabove referred to, the proceeds received from the sale of the barge 'Ruby', and other items properly credited to Suryan's Inc. There is no evidence in the record that either Suryan's Inc. or Rubinstein & Caraco directed or made any express or specific application of said payments to any particular debit items of said account. Defendants Rubinstein & Caraco rendered to Suryan's Inc. monthly statements thereon, and in all of said monthly statements showed the net balance due and owing by Suryan's Inc. to the defendants Rubinstein & Caraco.

"On September 3, 1938, defendants Rubinstein & Caraco demanded of Suryan's Inc. and prevailed upon officers and directors of Suryan's Inc. to instruct Mansfield, who held title to the barge 'Ruby', to transfer the barge 'Ruby' to the defendants Rubinstein & Caraco, as additional security for the payment of the preexisting indebtedness due by Suryan's Inc. to Rubinstein & Caraco in a sum in excess of $134,408.60. At said time the defendants Rubinstein & Caraco had full knowledge of the fact that Suryan's Inc. was then hopelessly insolvent and that the transfer of said barge 'Ruby' to them under the circumstances would constitute an unlawful preference and the said defendants Rubinstein & Caraco were not acting in good faith. During the months of June, July and August, 1938, defendants Rubinstein & Caraco were advised from time to time by Suryan's Inc. of the progress made in its fishing operations and from time to time Suryan's Inc. wired or wrote to the defendants Rubinstein &

Caraco for additional advances with which to pay labor, fish or supplies, and advised said defendants on or about August 2, 1938, that Suryan's Inc. owed $13,000.00 for Alaska labor, fish and supplies, and would need $45,000.00 more to pay creditors of Suryan's Inc. at Puget Sound. On or about September 1, 1938, the corporation's floating cannery, the 'M/V Commander' returned from Alaska to Anacortes, Washington, and the defendants Rubinstein & Caraco went to Anacortes and were advised that Suryan's Inc. was indebted in a large sum on account of checks issued by Suryan's Inc. in June, July and August, 1938, in payment of labor, fish, supplies, materials, miscellaneous expenses, and charter hire, which said checks had been dishonored and were held by the payees thereof, and that Suryan's Inc. did not have any money in its bank account to meet said checks, and that such dishonored and worthless checks amounted to the sum of $31,958.28. At or about such time said defendants knew that there was approximately $52,500.00 for labor, fish, materials, equipment, supplies, miscellaneous expenses, and charter hire owed by Suryan's Inc., which amount Suryan's Inc. was unable to pay.

"The barge 'Ruby' has been disposed of by the defendants Rubinstein & Caraco, and return thereof cannot be made to the plaintiff herein. On September 3, 1938, the barge 'Ruby' was of the reasonable value of $10,000.00."

The trial court concluded that plaintiff receiver was entitled to recovery against the copartners in the amount of ten thousand dollars, value of the "Ruby" as of September 3, 1938. Judgment was entered accordingly. The copartners appealed.

Counsel for appellants first contend that the court erred in finding that the barge "Ruby" was the property of Suryan's, instead of the property of appellants, and that in arriving at that conclusion the court erred in considering as evidence against appellants purported minutes of a meeting (at which appellants were not present or represented) of directors of Suryan's, Inc.,

recording passage of resolution authorizing H. E. Mansfield to purchase, through appellants, the "Ruby" for Suryan's. It is argued that the only direct evidence touching on the agreement respecting title to the "Ruby" is the testimony of the two Rubinsteins, Eliezer Caraco, and Mansfield, an interested witness, the only persons who had anything to do with the purchase of the vessel.

We may concede the inadmissibility in evidence of the minutes of the stockholders' meeting, and disregard the conviction of the trial court that, even if appellants were not present in person or by representation at that meeting, appellants were fully informed concerning the authority given at that meeting to Mansfield.

If the finding of the trial court as to the ownership of the "Ruby" were based solely, which it is not, upon the conflicting testimony of the four witnesses—each of whom may be classified as an interested witness—under the rule (which we have consistently followed) that a finding of the trial court based upon conflicting evidence will not be disturbed on appeal when the evidence does not preponderate against that finding, in view of the opportunity of the trial court to view the witnesses and their demeanor, and to judge of their credibility, we would not disturb the finding.

The facts are as follows: Appellants, who were engaged in the business of financing canneries and fisheries, entered into a contract, March 5, 1938, with Suryan's, under which appellants agreed to lend money to Suryan's to assist the latter in its fishing operations for the 1938 season. Suryan's was indebted at that time to a certain Seattle bank in the amount of twenty-five thousand dollars, payment of which was secured by a first mortgage on the borrower's boats and floating equipment.

The first type of loan by appellants to Suryan's under

the agreement of March 5, 1938, was a fixed mortgage of thirty thousand dollars, secured by a second mortgage on the cannery boat and floating equipment. The second type of loan consisted of advances against bills of lading covering the pack. At the time of the execution of the financing agreement, the financial condition of Suryan's was not a healthy one.

H. E. Mansfield, a stockholder of Suryan's, one of the incorporators of the corporation, and the superintendent of Suryan's cannery boat "Commander," handled all negotiations with appellants involving the purchase of the "Ruby," which is the subject matter of this controversy. Mansfield, who was also engaged in the business of writing insurance, was a customs broker and was experienced in the preparation of ship's papers. He testified that, after he was approached by Carl Rubinstein in connection with the matter of financing Suryan's, he was present at conferences with Carl Rubinstein, Carl Rubinstein's son, and Eliezer Caraco. He advised appellants of the number of unpaid accounts outstanding and, on one occasion, he supplied to Rubinstein a list of the then unpaid creditors of Suryan's. The two Rubinsteins and Caraco denied any knowledge of the amounts due or the name of any creditor with the exception of the American Can Company.

In one paragraph of the financing contract, Suryan's falsely warranted that it had no debts, obligations or liabilities, except the indebtedness of twenty-five thousand dollars to a bank, payment of which was secured by a first mortgage on Suryan's boats and floating equipment, and approximately an equal amount owing to stockholders on promissory notes. It is more than reasonably inferable from the evidence that appellants had full knowledge of the nature and extent of the obligations of Suryan's and were not deceived by the false declaration. The trial court aptly observed:

" . . . the business training and experience of defendants, the nature of the business carried on by them, and their rather well-known success in the business world confirm and corroborate the testimony of Mansfield that the defendants were fully apprised of the nature and extent of these obligations."

That appellants attempted to obtain as security other assets of Suryan's, which assets were not created by appellants' advance of thirty thousand dollars, is clear from the language of the contract which provides that appellants shall also be given a first mortgage upon all land, trap locations, machinery, plant equipment, and personal property used in connection with the cannery and fishing operations, which were not included in the mortgage to the bank. That is, the new creditors—appellants—were endeavoring to secure for themselves not only the "pack" of the debtor corporation, but were also trying to impose upon assets then in existence a further obligation or promise of an obligation to secure money advances to be made. The financing contract obligated appellants to keep a proper set of books which would accurately recite the financial relationship between appellants and their debtor, Suryan's.

Suryan's processed and canned its salmon on the floating cannery "Commander." It was essential in carrying on its operations in Alaska for Suryan's to have a barge to be moored near the "Commander" for use as a warehouse and as living quarters for the crew. The barge "Jitney," purchased for that purpose, sank May 4th or 5th, 1938, when taking on cargo in Seattle in preparation for the trip to Alaska. This emergency required the acquisition of another barge which would have to be equipped and sent north immediately as the "Commander" was about ready to sail for Alaska and it was getting late in the season. In the latter part of April or early in May, 1938, Mansfield, acting for Suryan's, advised appellants that he had found a barge,

known as the "Ruby," which could be purchased for forty-two hundred dollars.

The minutes of a meeting of the stockholders of Suryan's, held May 7, 1938, recite that authority was given to Mansfield to purchase the vessel for forty-two hundred dollars upon such terms "as can be agreed upon, and Carl Rubinstein will finance for the company," and for

" . . . such repairs as are required for use thereof, and Mr. Rubinstein will finance. . . . the company to execute to and with Harry Mansfield an agreement whereunder he agrees to purchase the Ruby on return from Alaska for our cost thereof plus the actual cost of repairs therefor. . . ."

The "Ruby" was purchased May 9, 1938, from the Pirate Fisheries Company for forty-two hundred dollars. Twenty-one hundred dollars advanced by appellants was paid at the time of the purchase, and the remainder of the purchase price was evidenced by a note executed by Mansfield as an individual, and also signed by Mansfield in the name of Suryan's, Inc., by himself as manager of the corporation. Payment of this note was secured by a mortgage on the vessel, which purchase-money mortgage was also signed individually in the name of H. E. Mansfield as mortgagor.

Carl Rubinstein, Sam Rubinstein, and Eliezer Caraco testified that when the "Ruby" was purchased it was upon the expressed understanding with Mansfield that title to the barge was to be taken in the name of appellants, Suryan's to have the option to purchase the vessel at any time during the fishing season, or within a reasonable time after the season closed, for an amount equal to all sums expended by appellants in the purchase, repair, and equipping of the vessel. They further testified that Mansfield took title in his own name without their consent or approval, and without

their knowledge until the "Ruby" returned from Alaska in September, 1938.

The testimony of those three witnesses is in sharp conflict with the testimony of Mansfield. He testified that as a representative of Suryan's he took title to the "Ruby" in his own name because there was no officer of the corporation present. The bill of sale was duly recorded (the mortgage was never placed of record) in the office of the collector of customs. Unless the bill of sale had been thus recorded, a prerequisite of which appellants were not ignorant, the vendee named therein could not have executed a mortgage on the vessel.

Mansfield positively testified that he informed Carl Rubinstein, at the time the arrangements were made for the purchase of the "Ruby," that in order to expedite the transfer it would be necessary to place the title in his (Mansfield's) name and later on to transfer title to Suryan's. The day before Mansfield departed for Alaska, he saw Rubinstein who then knew that the title to the "Ruby" was in the name of Mansfield, who had previously so informed Rubinstein, but Rubinstein voiced no objection to the title being in Mansfield's name. Mansfield, who held the title for Suryan's and never claimed he owned the "Ruby," further testified that neither Rubinstein nor Caraco told him to buy the barge in their name for them. R. D. Suryan, vice-president of Suryan's, testified that he at all times thought the "Ruby" was owned by Suryan's and that he knew that Mansfield had agreed to purchase the barge from Suryan's if Suryan's did not want the vessel.

It was necessary that the "Ruby," which was a sailing schooner, be converted into a barge for use of Suryan's in its fishing operations. The cost of the necessary repairs and equipment for that purpose was

paid by appellants. The work was performed on order of the officers of Suryan's and was charged to " 'Ruby' and Owners, care Suryan's, Inc., and Carl Rubinstein, Seattle, Washington." Those expenses, which were in excess of seven thousand dollars, together with the purchase price of the barge, represent an investment in excess of eleven thousand dollars.

On May 11, 1938, the "Ruby" was insured in the amount of seven thousand dollars in the name of Suryan's, Inc., and Rubinstein & Caraco, which insurance was increased May 19, 1938, to ten thousand dollars.

Beginning with the first payment made upon the "Ruby" and throughout the year 1938, as expenditures were made from time to time on account of this vessel, appellants charged on their own books the individual items of disbursement against the account of Suryan's. There is no showing of any agreement for return of the "Ruby." No entry appears in appellants' books of any charge for a lease or charter of the "Ruby" by appellants, or that appellants had any interest in the "Ruby" from the time of her purchase in May, 1938, until September, 1938, when title to the vessel was transferred by Mansfield to appellants.

On each of the several items of disbursement interest was charged by appellants against the account of Suryan's at the rate of one-half of one per centum a month on the several advances computed on monthly balances. It was the practice of appellants, and that practice was followed in connection with the "Ruby," to make the charge as and when the disbursement was authorized, and the interest charge made thereafter without particular regard to the actual time of payment of the bills against the vessel.

September 3, 1938, when Suryan's was hopelessly insolvent and demands for payment of labor and other claims were insistent, a meeting was held of the rep-

resentatives of the interested parties. Upon demand of appellants, title to the "Ruby," subject to the unpaid part (twenty-one hundred dollars and accumulated interest thereon) of her purchase price, was transferred by Mansfield to appellants. That transfer of September 3, 1938, was not placed of record by appellants until November 21, 1938.

Early in 1939, an action was brought by the holder of the mortgage on the "Ruby" for the unpaid purchase price. Appellants paid to that holder twenty-three hundred dollars in settlement of the claim and secured for themselves release of the mortgage. When, in April, 1939, appellants paid the unrecorded mortgage of twenty-three hundred dollars on the "Ruby," they charged Suryan's on their books with that item. When they sold the "Ruby" (after payment of the mortgage thereon) to R. D. Suryan, appellants credited Suryan's with the amount of sixty-three hundred dollars, the sale price of the vessel. On appellants' books Suryan's was charged with an item of personal property taxes on the "Ruby" paid by appellants, an entry that is hardly consistent with appellants' subsequent claim of ownership of the "Ruby."

The issue as to the ownership of the "Ruby" is one of fact. The trial court, which was in a better position than we to pass upon the credibility of the witnesses, expressed the conviction that the testimony of Caraco and the two Rubinsteins on this phase of the case is untrue.

If the testimony of Mansfield is to be believed—the findings reflect the court's acceptance of that testimony as true—Suryan's owned the "Ruby" which was purchased on its behalf by Mansfield, Suryan's representative, with money obtained from appellants for Suryan's. We may disregard the minutes of the meeting of the stockholders of Suryan's. The course

of conduct of the parties and the written record—books kept and statements of account prepared by appellants —of the transactions between appellants and Suryan's refute appellants' claim that the "Ruby" was owned by appellants.

If, as appellants testified, title to the "Ruby" was to be in them, their inactivity, when they knew the payment of twenty-one hundred dollars was deferred and was to be secured, has not been satisfactorily explained. Appellants testified that Mansfield promised to bring the papers to them but failed to keep his promise.

Appellants were not ignorant of the requirement of recordation in the office of the collector of customs of the bill of sale of the vessel in order that the vendee named therein could execute a mortgage on the vessel. The bill of sale was placed of record. Appellants made no inquiry concerning the bill of sale, or the note, or mortgage which evidenced the deferred payment on the purchase price. They saw Mansfield in Seattle before he departed for the north and they saw him at Anacortes in May, 1938, the Sunday before he sailed for Alaska, but on neither occasion did they inquire of Mansfield concerning the title or the execution of the note and mortgage.

Appellants frequently communicated by telegraph with Mansfield after the latter had departed for Alaska, but the record is bare of evidence of anything in the nature of inquiry or protest concerning title to the "Ruby." In June, 1938, when Carl Rubinstein was in Alaska and aboard the "Commander," he made no inquiry or protest concerning the title to the "Ruby," nor did he say aught concerning Mansfield's failure to keep his promise to return the papers to appellants.

The evidence overwhelmingly sustains the finding

that the "Ruby" was purchased for and owned by Suryan's.

The trial court found that, on September 3, 1938, the barge "Ruby" was of the reasonable value of ten thousand dollars. Counsel for appellants contend that the reasonable market value of the "Ruby" on the date in question was not in excess of six thousand dollars.

The "Ruby" was built in 1902. It was a three-masted, wooden auxiliary fishing schooner, one hundred and thirty-two feet in length, with a thirty-five foot beam, and a draft of approximately six feet. One witness, the president of the company which formerly owned the "Ruby," testified that in 1935 his company sold the vessel to the Pirate Fisheries Company for twenty-seven hundred and fifty dollars. The vessel continued, after her sale in 1935, to lie in Lake Union until May, 1938, when the vessel was purchased by Suryan's as recited above. It is true that in May, 1938, when the "Ruby" was sold for forty-two hundred dollars, the purchaser did not have time to negotiate for a better bargain. Rubinstein testified that, after the "Ruby" was transferred in September, 1938, to appellants, he repeatedly endeavored, without success, to sell the vessel for five to six thousand dollars, but that he was able to sell the "Ruby" in the early part of 1939 to R. D. Suryan for sixty-three hundred dollars. Suryan testified that, when Rubinstein first offered the "Ruby" to him, the sale price of the vessel was eight thousand dollars. May 11, 1938, which was prior to the completion of the work of reconditioning the "Ruby," the vessel was insured in the amount of seven thousand dollars. After the "Ruby" was repaired, the insurance was increased to ten thousand dollars. It may be that insurance values are higher than market values, but it was an item to be considered. The pur-

chase price plus the expense of reconditioning of the "Ruby" made the cost of the vessel approximately twelve thousand dollars. There was testimony of those who were qualified to appraise vessels which warranted the court in finding that the "Ruby" was of the reasonable value of ten thousand dollars September 3, 1938.

■ Appellants' offer to prove that, subsequent to the date of arrival of the last shipment of fish and subsequent to September 3, 1938, when Mansfield transferred the "Ruby" to appellants, they made substantial additional advances, which were unsecured, for the benefit of Suryan's, and that those advances far exceeded the value of any security that appellants had under their contracts or otherwise, was correctly rejected. The rejection of that offer of proof and the refusal to offset the advances offered to be proved against the value of the "Ruby" are assigned as error. This contention is based upon Rem. Rev. Stat., § 5831-2, subd. (c), reading as follows:

"If a creditor has been preferred, and afterwards in good faith gives the insolvent corporation further credit without security of any kind for property which becomes a part of the assets of the insolvent corporation, the amount of such new credit remaining unpaid at the time of the application for the appointment of a trustee, receiver or other liquidating officer for such corporation, may be set off against the amount which would otherwise be recoverable from him."

The finding of the trial court that appellants were not acting in good faith when they secured the transfer of the "Ruby" to themselves is amply sustained by the evidence. *No sums were thereafter expended* by appellants *for* preservation of the *"Ruby" for benefit of Suryan's.* The only affirmative defense of offset pleaded, or upon which appellants relied, was the one respecting the advancements for purchase and repairs

of the "Ruby," all of which were made long prior to September 3, 1938, the date the "Ruby" was transferred by Mansfield to appellants.

We repeat that no money was expended, after the appellants secured the transfer and possession of the "Ruby," for the preservation of that vessel for benefit of debtor Suryan's. There was no legal liability on the part of appellants to pay the twenty-three hundred dollars to the mortgagee of the "Ruby." The mortgage was unrecorded and void as to creditors. In *McElroy v. Puget Sound Nat. Bank,* 157 Wash. 43, 288 Pac. 241, we said:

"It is next urged that, in any event, appellant was acting in good faith and should be allowed all of its disbursements expended in taking, caring for, repairing, storing and selling the personal property involved. We cannot agree that the bank was acting in good faith as the law defines that term in such a transaction as this. The evidence abundantly establishes that the bank well knew, or should have known, of the insolvency of the mortgagor when it took the mortgage, and it was bound to know the law applicable, hence it proceeded at its peril."

Had Suryan's, instead of appellants, paid the twenty-three hundred dollars on the void mortgage to the mortgagee Pirate Fisheries Company it would have constituted a preference which might have been set aside by the receiver of the insolvent Suryan's. One who creates a preference is not acting in good faith and may be held liable therefor. In *McKnight v. Shadbolt,* 98 Wash. 665, 671, 168 Pac. 473, we said:

"It is obvious that, if the property had been transferred directly to Shadbolt in payment of a debt due him, the transaction would constitute a preference and that the trustee would be entitled to recover the property or its value. *Benner v. Scandinavian-American Bank,* 73 Wash. 488, 131 Pac. 1149, Ann. Cas. 1914D 702; *Ronald v. Schoenfeld* [94 Wash. 238, 162 Pac. 43],

*supra.* The effect on the other creditors is the same whether Shadbolt took the property in payment of his own account, or on his agreement to pay a debt due another. The assets of the corporation were depleted to the same extent. The effect would have been the same if Shadbolt had paid the debts, taken assignments of them and used these assignments as a payment to the company for the chattels turned over to him. This would clearly have been a preference. We think that the fact that Shadbolt paid the debts of others and not his own will not take the transaction out of the class which are held to be void as creating a preference under § 60 of the Bankruptcy Law (30 Stat. 562; U. S. Comp. St. 1916, § 9644).

" 'To constitute a preferential transfer, it is immaterial to whom the transfer is made, if it be made for the purpose of paying the claim of one creditor in preference to those of others.' *Hackney v. Raymond Bros. Clarke Co.,* 68 Neb. 624, 94 N. W. 822, 99 N. W. 675."

When appellants sold the "Ruby" to R. D. Suryan, they immediately reimbursed themselves from the sale price of the "Ruby" for the twenty-three hundred dollars they had paid to satisfy the mortgage on that vessel, and charged that amount on their books against Suryan's. The sixty-three hundred dollars they received from the sale of the "Ruby" to R. D. Suryan, was credited on appellants' books to Suryan's. That is, appellants have already been paid twenty-three hundred dollars and, in addition thereto, have received the sum of four thousand dollars.

Counsel for appellants next insist that if appellants are not the owners of the "Ruby" they are entitled to offset against the value of that vessel payments made by them of (1) twenty-one hundred dollars on purchase price of the "Ruby," (2) twenty-three hundred dollars to satisfy mortgage on the "Ruby" subsequent to transfer of the "Ruby" to appellants in September, 1938, and (3) cost of repairs,

fittings, and equipment necessary to make the "Ruby" seaworthy and for which maritime liens existed. Respecting the third item, it is argued that, under the Federal statute (U. S. C. A., Title 46, § 971), each of the persons furnishing repairs, supplies, or other necessities to the vessel upon the order of the owner of that vessel, or of a person authorized by the owner, had a maritime lien on the vessel enforcible by suit *in rem*, "and it shall not be necessary to allege or prove that credit was given to the vessel," therefore, as appellants paid the items for which maritime liens could be asserted, they are entitled to subrogation to the rights of the original lien holders.

Assuming, but not deciding, that the affirmative defense of set-off is not inconsistent with appellants' claim of ownership of the "Ruby," appellants have no right of set-off.

If appellants in May, 1938, thought they owned the "Ruby" they could not then have had in mind any thought of claiming to have advanced money for reconditioning of the "Ruby" on the credit of that vessel. An owner can not have a maritime lien on his own vessel.

"A maritime lien does not exist in favor of the owner or any other person who does not render services or furnish supplies to and on the credit of the vessel. It depends upon a tacit hypothecation, implied in law; the theory being that the ship's necessities, in the absence of the owner's personal credit, can only be relieved by pledging her, and therefore excludes owners." *The Cimbria,* 214 Fed. 128, 132. See, also, 38 C. J. 1201.

Carl Rubinstein testified that the appellants guaranteed all bills for reconditioning of the "Ruby" as it was appellants' boat. He further testified that he guaranteed all the bills because he had security under the financing contract of March 5, 1938.

All of the items advanced for purchase and reconditioning of the "Ruby" were charged to Suryan's upon appellants' books and interest charged thereon, as recited above. Suryan's was given credit upon its bills for returned merchandise, fish sold, and other items of credit. Those who supplied materials for and those who were employed in repair of the "Ruby" might have had a maritime lien on the vessel but they waived that right by looking for payment to appellants, who were billed therefor and who paid those items of expense and charged same in account against Suryan's.

In *Marshall & Co. v. The President Arthur*, 279 U. S. 564, 73 L. Ed. 846, 49 S. Ct. 420, the furnisher of coal to a ship took trade acceptances endorsed by third parties in payment for coal. The United States supreme court held that the coal was not furnished on the credit of the vessel and that the lien had been waived by looking to the credit of the trade acceptances and the endorsers. In the case at bar those who furnished supplies and made repairs looked to the guarantee of appellants who, in turn, looked to the credit of Suryan's for their security under the financing agreement of March 5, 1938.

As the furnishers of material and the repairers did not have any right to a maritime lien, appellants could not have a maritime lien by subrogation. So, too, by looking to the credit of Suryan's and to the security which they had under the financing agreement of March 5, 1938, appellants waived any right they may have had to a maritime lien on the "Ruby." As observed by the trial court:

". . . the numerous entries by the firm of Rubinstein & Caraco on their own books in form and manner which connote merely the obligation of an open account; the charges for interest continuously and consistently made for the sums advanced on this account; the failure to receive or record any mortgage;

the failure to take or assert any assignment of maritime lien; the absence of written data of the assertion of such a claim between the parties themselves; the hurried transfer of the vessel to Rubinstein & Caraco at the end of the season at a time when Suryan's, Inc., was in great financial distress and then insolvent by the confession even of counsel for the defendants;—all of these acts are those consistent with the conduct of a general creditor and one who has accepted the general credit of the debtor."

Not until this action had been instituted, was there any thought on the part of appellants of a maritime lien.

The advances were made by appellants upon the open credit of Suryan's and payment for those items was secured by the financing agreement of March 5, 1938. It is true the advances for reconditioning the vessel enhanced the value of that vessel, but those advances were not made by appellants with any thought of lien upon the vessel. *Ladd v. Perry*, 28 F. (2d) 975, cited by appellants is manifestly distinguishable from the case at bar. In the case cited, the son, who made improvements upon land occupied under a verbal lease from his father was acting in good faith when he made the improvements.

 Counsel for respondent contend that, long prior to appellants' claim of maritime lien or right of set-off, the law of application of payments discharged all items of advancements for the "Ruby."

It is the rule in this state that, if the debtor make no direction at the time of payment as to the application of payments, the right of application belongs to the creditor at any time before the account is settled between the parties or before the action is brought. If neither the debtor nor the creditor applies the payment specially, then the law will apply the payments

to the oldest items of account. *Diettrich Bros., Inc. v. Anderson,* 183 Wash. 574, 48 P. (2d) 921.

Counsel for appellants argue that the rule of application of payments is inapplicable because not timely raised by respondent. Appellants contend that it was prerequisite to invoking the rule of application of payments as a defense to appellants' affirmative defense of set-off, that respondent plead the rule in his reply or raise the question of its application during the trial so that the issue could be met and evidence offered thereon and the trial court afforded an opportunity to pass on the question.

The claim of appellants to the right of set-off was pleaded as an affirmative defense. The record of account of Suryan's with appellants was introduced in evidence. The ledger sheets show that Suryan's turned over to appellants all salmon packed during the 1938 season and appellants realized from sales of that salmon in excess of one hundred thousand dollars. As the proceeds from the sales were received from time to time appellants credited such amounts to the account of Suryan's and also credited Suryan's for merchandise returned and other items of credit. At the time of making payments for purchase price and reconditioning of the "Ruby," as shown by the ledger sheets, and by the monthly statements, Suryan's was indebted to appellants for approximately fifty thousand dollars. Appellants received more than one hundred and seven thousand dollars from sale of fish, sale of the "Ruby" etc. As these proceeds were received, Suryan's did not, nor did appellants, direct or make, the trial court found, "any express or specific application of said payments to any particular debit items of said account."

Respondent's reply to appellants' answer is not fatally defective. The defect, if any, of which appellants complain, is one capable of being cured by

amendment. The evidence on which respondent relies for invoking the rule of application of payments was introduced by appellants and by respondent. Those proofs show that, if the proceeds received by appellants had been applied to payment of the oldest items of the account with Suryan's, the items for the purchase price and repairs of the "Ruby" would have been discharged by the application of the proceeds received from time to time by appellants from sale of salmon, etc. The reply will be deemed amended to conform to the proof.

It follows, as Suryan's and appellants did not direct the application of payments, that the law will apply the payments to the oldest items of the account. The finding of the trial court as to the debiting and crediting of items in the account between appellants and Suryan's, and that neither debtor nor creditors directed application of payments to any particular debit items of the account—the finding is amply supported by the evidence—sustains the judgment which is bottomed on this phase of the cause, in part at least, on the rule of application of payments.

The facts do not bring the case at bar within the exception to the preference rule presented in cases in which the insolvent corporation makes transfers or mortgages of its property in good faith to secure present advances of money to be used in extricating itself from its difficulties or otherwise in continuing the business. See *Terhune v. Weise*, 132 Wash. 208, 231 Pac. 954, 38 A. L. R. 94; 19 C. J. S. 1107.

The judgment is affirmed.

ROBINSON, C. J., BEALS, SIMPSON, and JEFFERS, JJ., concur.